IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

|  |  |  |
|---|---|---|
| TRENISHA WEBSTER, | * | |
| | * | 4:19-cv-00302 |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| JENNIFER WESTLAKE, | * | ORDER GRANTING IN PART |
| LORI KELLY, and | * | AND DENYING IN PART |
| DES MOINES, IOWA, | * | PLAINTIFF'S MOTION FOR |
| | * | SUMMARY JUDGMENT |
| Defendants. | * | |
| | * | |

Before the Court are Plaintiff Trenisha Webster's Motion for Partial Summary Judgment filed on August 14, 2020, and Defendants' City of Des Moines, Lori Kelly, and Jennifer Westlake's Motion for Summary Judgment filed on September 3, 2020. ECF Nos. 23, 26. Defendants filed a Response to Plaintiff's Motion on September 3, 2020. ECF No. 27. Plaintiff filed a consolidated Response to Defendants' Motion and Reply to Defendants' Response on September 24. ECF No. 33. The Court heard oral argument on the Motions on November 24, 2020. ECF No. 36. The matter is fully submitted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 16, 2018, Defendants Jennifer Westlake and Lori Kelly, detectives with the Family Conflict Unit of the Des Moines Police Department, visited Plaintiff Trenisha Webster's home with Iowa Department of Human Services (DHS) child protective worker (CPW) Melissa Krug, Des Moines Police Officer Lindsey Kenkel, and Des Moines Police Detective Brian Mathis. *See* ECF No. 24; ECF No. 23 Ex. 2 at 14:00. CPW Krug had previously visited the home to investigate a claim of child abuse involving Plaintiff's minor child, L.B. ECF No. 28

1

at 4.  CPW Krug saw injuries on L.B.'s legs, and L.B. informed CPW Krug that Robert Rushing, Plaintiff's romantic partner at the time, inflicted the injuries using a belt.  *Id.*  L.B. also stated Plaintiff had beaten her in the past.  *Id.*

Krug photographed L.B.'s injuries[1] and then attempted the aforementioned home visit. *Id.*  Finding Plaintiff "dismissive" and "defensive," CPW Krug contacted the Des Moines Police Department.  *Id.* at 5.  Defendants Westlake and Kelly agreed to meet Krug at the home "to ensure the safety of the child and to have [Plaintiff] cooperate with DHS and sign a safety plan." *Id.*  Defendants did not seek or obtain arrest warrants, a search warrant, or a removal order prior to the home visit.  ECF No. 23-1 ¶ 16.

The remainder of the relevant interactions in this case were clearly recorded by police body cameras.  *See* ECF No. 24; ECF No. 23 Ex. 1 at 1:19–6:38, Ex. 2 at 8:44–14:03.  Both parties agree the footage accurately represents the interaction between Plaintiff and Defendants Westlake and Kelly on October 16, 2018.  ECF No. 23-1 ¶ 4.  The material facts in this case are therefore readily ascertainable.  Because this decision relies heavily upon the body camera footage, it is prudent to describe the footage in detail.

The Court takes judicial notice, based on body camera footage from Defendant Westlake and corroborated by footage from Officer Kenkel's body camera, that an interaction began when Defendant Westlake knocked on Plaintiff's back door and she answered.  ECF No. 23 Ex. 1 at 1:19, Ex. 2 at 8:44.  Less than six minutes later, Defendants arrested Plaintiff.  ECF No. 23 Ex. 1 at 6:38, Ex. 2 at 14:03.  Based upon the body camera footage, the Court takes further notice that the intervening dialogue proceeded as follows:

DETECTIVE WESTLAKE: Hi, are you Trenisha?

---

[1] Plaintiff disputes this fact, as the photos are not in evidence.  ECF No. 33-2 ¶ 15.  For the purposes of this Order, the Court assumes the photos were taken but makes no findings as to what the photos depicted.

MS. TRENISHA WEBSTER: What is this for?

DETECTIVE WESTLAKE: This is—I'm Detective Westlake with the Des Moines Police Department. I need to talk to you about your daughter, L.B.

MS. TRENISHA WEBSTER: L.B.

DETECTIVE WESTLAKE: Yeah. L.B., okay. Yeah.

MS. TRENISHA WEBSTER: Hold on.

DETECTIVE WESTLAKE: Is she here?

MS. TRENISHA WEBSTER: Do you need speak to her?

DETECTIVE WESTLAKE: I'd like to see her and see how she is.

MS. TRENISHA WEBSTER: She's fine.

DETECTIVE WESTLAKE: Okay. That's not what I said. I said I'd like to speak to her. Is Robert here?

MS. TRENISHA WEBSTER: Why?

DETECTIVE WESTLAKE: Umm, because—

MS. TRENISHA WEBSTER: I need to know the full extent of all of this.

DETECTIVE WESTLAKE: So DHS got a call from the school today because she has injuries to her legs. Are you aware of the injuries to her legs?

MS. TRENISHA WEBSTER: She has no injuries.

DETECTIVE WESTLAKE: Okay. I have photos of the injuries to her legs.

MS. TRENISHA WEBSTER: Okay. They're not considered injuries.

DETECTIVE WESTLAKE: Okay. Those actually would be considered injuries; okay? And so DHS came here to talk to you guys about what happened and how she got them. Do you know how she got them?

MS. TRENISHA WEBSTER: Yes.

DETECTIVE WESTLAKE: Okay. How did she get them?

MS. TRENISHA WEBSTER: She got them.

DETECTIVE WESTLAKE: Okay.

MS. TRENISHA WEBSTER: Next question.

DETECTIVE WESTLAKE: How—how did she get them? That's what I'm saying.

MS. TRENISHA WEBSTER: She got them. She was punished.

DETECTIVE WESTLAKE: Okay.

MS. TRENISHA WEBSTER: Next question.

DETECTIVE WESTLAKE: Okay. So is this a best—is this a belt mark then, is that how she was punished? Is that with a belt?

MS. TRENISHA WEBSTER: It is a marking of a punishment.

DETECTIVE WESTLAKE: Okay. And did you do that or did Robert do that?

MS. TRENISHA WEBSTER: It doesn't matter who did it.

DETECTIVE WESTLAKE: Well, it does matter who did it.

MS. TRENISHA WEBSTER: Why?

DETECTIVE WESTLAKE: Because this is excessive punishment.

MS. TRENISHA WEBSTER: Is someone getting arrested or does anybody have a warrant, is the question?

DETECTIVE WESTLAKE: Actually, I—I—I am gonna arrest Robert, if he's the one that did it. Unless you tell me did you it.

MS. TRENISHA WEBSTER: For what?  What is this?

DETECTIVE WESTLAKE: Because these are excessive.

MS. TRENISHA WEBSTER: Those are not considered excessive.

DETECTIVE WESTLAKE: They—they are excessive.

MS. TRENISHA WEBSTER: How so?

DETECTIVE WESTLAKE: I've already talked to the County Attorney; okay?  So we're here to try to, like, make a safety plan, make sure she's okay.  Because these marks are not okay.

MS. TRENISHA WEBSTER: She's fine.

DETECTIVE WESTLAKE: Listen.  I get it.

MS. TRENISHA WEBSTER: She's my daughter and I raise her.

DETECTIVE WESTLAKE: Right.  But these marks are not okay.

MS. TRENISHA WEBSTER: She bruises easily.  She takes after her mother.  I bruise easily.

DETECTIVE WESTLAKE: Okay.  This isn't—this isn't a bruise.  This is an open—this is a skin broken type of injury.  This is not okay.

MS. TRENISHA WEBSTER: Do you have kids?

DETECTIVE WESTLAKE: Does it matter?

MS. TRENISHA WEBSTER: Yes, it does.

DETECTIVE WESTLAKE: Well, why is that?

MS. TRENISHA WEBSTER: You're asking me about mine.  So do you have kids?

DETECTIVE WESTLAKE: That doesn't matter.

MS. TRENISHA WEBSTER: It does matter.

DETECTIVE WESTLAKE: Because I investigate cases with kids.

MS. TRENISHA WEBSTER: Because I want to know how you discipline children.

DETECTIVE WESTLAKE: We're not talking about whether or not I have kids or how I discipline them.

MS. TRENISHA WEBSTER: How do you discipline your kids?

DETECTIVE WESTLAKE: That doesn't matter.

MS. TRENISHA WEBSTER: So why should I continue to ask questions—answer questions?

DETECTIVE WESTLAKE: Because I have proof of injuries to your daughter.

MS. TRENISHA WEBSTER: Yeah, my daughter.

DETECTIVE WESTLAKE: Right.  But—

MS. TRENISHA WEBSTER: So how do you discipline your children?

DETECTIVE WESTLAKE: —just because it's your daughter doesn't mean that these injuries are okay.

MS. TRENISHA WEBSTER: I didn't say they were okay.

DETECTIVE WESTLAKE: You just said—

MS. TRENISHA WEBSTER: It's called discipline.

DETECTIVE WESTLAKE: Right.

DETECTIVE KELLY: No, this is called a—

DETECTIVE WESTLAKE: This is called abuse.

MS. TRENISHA WEBSTER: I'm not talking to you.

DETECTIVE KELLY: This is a beating.

MS. TRENISHA WEBSTER: That is not a beating.

DETECTIVE WESTLAKE: That is not—this is—

MS. TRENISHA WEBSTER: Do you have kids?

DETECTIVE KELLY: Yes, I do have kids.

MS. TRENISHA WEBSTER: Okay. Mind your damn business. Next question.

DETECTIVE WESTLAKE: This is how it is. Like, this is not okay. So you can either cooperate or not cooperate.

MS. TRENISHA WEBSTER: I am cooperating, but—

DETECTIVE WESTLAKE: You're not cooperating.

MS. TRENISHA WEBSTER: —it's my child.

DETECTIVE WESTLAKE: Right. And this is abuse.

MS. TRENISHA WEBSTER: And I just asked you a question.

DETECTIVE WESTLAKE: What—what is your question?

MS. TRENISHA WEBSTER: My question is: Do you have children?

DETECTIVE WESTLAKE: That has nothing to do with it.

MS. TRENISHA WEBSTER: It does.

DETECTIVE WESTLAKE: I don't have children.

MS. TRENISHA WEBSTER: You're questioning my choices.

DETECTIVE WESTLAKE: I investigate crimes, and I am trained to investigate crimes, regarding children.

MS. TRENISHA WEBSTER: And I am authorized by rights to ask my questions.

DETECTIVE WESTLAKE: Okay. So we're only going to go round and round so much; okay?

MS. TRENISHA WEBSTER: Yeah, we are.

DETECTIVE WESTLAKE: So you can work with DHS and you can work with myself, or you can not to.

MS. TRENISHA WEBSTER: I don't trust y'all. I don't trust the system.

DETECTIVE WESTLAKE: I'm not asking you to trust me.

MS. TRENISHA WEBSTER: DHS is the biggest sex trafficking company that there is. And don't you roll your eyes and smirk because you know it is. It's because of y'all—

DETECTIVE WESTLAKE: Okay.

MS. TRENISHA WEBSTER: —that black kids and other minority kids are taken away from their family and sent to other families and then later on become dead.

DETECTIVE WESTLAKE: Okay.

MS. TRENISHA WEBSTER: Thank you DHS.

DETECTIVE WESTLAKE: This is not how this is gonna go.

MS. TRENISHA WEBSTER: You're not doing that to my kid.

DETECTIVE WESTLAKE: Okay. Listen. I don't want to take away your kid.

MS. TRENISHA WEBSTER: You're not going to.

DETECTIVE WESTLAKE: Okay.  But this is abuse.

MS. TRENISHA WEBSTER: It is not called abuse.

DETECTIVE WESTLAKE: And so you guys—

MS. TRENISHA WEBSTER: This is called discipline.

DETECTIVE WESTLAKE: —can either sit down and discuss this with us or you can continue to argue.

MS. TRENISHA WEBSTER: You aren't arresting nobody today, I can tell you that.

DETECTIVE WESTLAKE: Well, I can actually.

MS. TRENISHA WEBSTER: I can discuss it with you, but everybody else stays outside because I don't trust nobody.

DETECTIVE WESTLAKE: Okay.  Well, I don't trust you enough to go into your house by myself.

MS. TRENISHA WEBSTER: That's fine.  You act like I'm gonna kill you.

DETECTIVE WESTLAKE: I have no idea what you're gonna do.  People do crazy things when the cops arrive.

MS. TRENISHA WEBSTER: What you're going to do is sit down at this table and don't go all (inaudible).

DETECTIVE WESTLAKE: And what are we gonna say?  The same thing that we're saying out here.

MS. TRENISHA WEBSTER: We're going to talk.

DETECTIVE WESTLAKE: I said we're only gonna do this for so long.  So it's—

DETECTIVE KELLY: Ma'am, where's your child?

MS. TRENISHA WEBSTER: My child is with me.  It doesn't matter where she's at.  She's with me.  Now, it's either you want to discuss it or leave it alone—

DETECTIVE WESTLAKE: Mostly you're gonna discuss it with DHS.

MS. TRENISHA WEBSTER: I don't trust DHS.

DETECTIVE WESTLAKE: But—

MS. TRENISHA WEBSTER: That's exactly why I refuse to talk to her.

DETECTIVE WESTLAKE: Okay.  So—

MS. TRENISHA WEBSTER: See she's telling you to go ahead and speak to me.  Thank you.  I don't trust DHS.

DETECTIVE WESTLAKE: No.  No.  What she's saying is we just take you now for interference.

MS. TRENISHA WEBSTER: You're not taking me nowhere.

DETECTIVE WESTLAKE: Okay.

MS. TRENISHA WEBSTER: So I just said—

DETECTIVE WESTLAKE: That's not—

MS. TRENISHA WEBSTER: Did I or did I not just said, you can sit at this table—

DETECTIVE WESTLAKE: Listen—

MS. TRENISHA WEBSTER: —and we can discuss it.

DETECTIVE WESTLAKE: That's not—This isn't gonna go exactly how you want it to go; okay?  I'm trying to discuss it and all you're telling me is my child, I discipline her.

MS. TRENISHA WEBSTER: Did I or did I not just say—

DETECTIVE WESTLAKE: So—

MS. TRENISHA WEBSTER: —we can discuss it.

DETECTIVE WESTLAKE: You can—you can—We can go down to the station, you, me and Robert, the kids.  We can go down there and we can discuss it.

MS. TRENISHA WEBSTER: You're not taking my kid, I can tell you that.

DETECTIVE WESTLAKE: But we're not just gonna sit in there and discuss it.

MS. TRENISHA WEBSTER: So do you want to discuss it at the table?

DETECTIVE WESTLAKE: Okay.  So what I'm gonna do right now is I'm gonna arrest you for interference.

MS. TRENISHA WEBSTER: You can't arrest me.

DETECTIVE WESTLAKE: Well, no, I can and I'm going to.

MS. TRENISHA WEBSTER: For what?

DETECTIVE WESTLAKE: For interference in my investigation.

MS. TRENISHA WEBSTER: Robert.  Call my attorney.

DETECTIVE WESTLAKE: Well, he needs to come out here, too—

MS. TRENISHA WEBSTER: He ain't going nowhere.

DETECTIVE WESTLAKE: —because we're gonna see the kids.

DETECTIVE KELLY: I got her.

OFFICER KENKEL: You got it, Lori?

DETECTIVE KELLY: Yeah.

MS. TRENISHA WEBSTER: Call my grandma.

ECF No. 29 at 74–86; ECF No. 23 Ex. 1 at 1:19–6:38, Ex. 2 at 8:44–14:03.

On October 17, 2018, Defendant Westlake authored a criminal complaint charging Plaintiff with "interference with official acts" under Iowa law.  ECF No. 23-1 ¶ 22; *see* Iowa Code § 719.1(1)(a).  The charges were dismissed with prejudice on April 15, 2019.  ECF No. 23-1 ¶ 30.

On September 19, 2019, Plaintiff filed a four-count Complaint and Jury Demand.  ECF No. 1.  Count I of the Complaint alleges a federal civil rights violation pursuant to 42 U.S.C. § 1983.  *Id.* at 6.  Counts II and III assert state common law claims for false arrest and abuse of process, and Count IV asserts a state respondeat superior claim against Defendant Des Moines, Iowa pursuant to Iowa Code section 670.2.  *Id.* at 7–10.  Defendant filed an Answer on November 6, 2019, and asserted seven affirmative defenses including qualified immunity under

federal law and state law immunity under Iowa Code section 670.4. ECF No. 5 at 7. On August 14, 2020, Plaintiff filed a Motion for Partial Summary Judgment asking this Court to decide all the claims in the Complaint as a matter of law except for the amount of Plaintiff's damages. ECF No. 23. Defendants filed a Motion for Summary Judgment on September 3, 2020, on the basis of qualified immunity and state law immunity. ECF No. 26. On the same date, Defendant filed a Response to Plaintiff's Motion, but Defendant did not respond to Plaintiff's Statement of Material Facts as required by Local Rule 56(b)(2). ECF No. 27; *see* ECF Nos. 26–29. Plaintiff filed a consolidated Response to Defendant's Motion and Reply to Defendant's Response on September 24. ECF No. 33. The Court heard oral argument on the Motions on November 24, 2020. ECF No. 36.

## II.  SUMMARY JUDGMENT STANDARD

"[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962) (quoting *Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620, 627 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir. 1976).

Federal Rule of Civil Procedure 56(a) provides, "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which

summary judgment is sought." Rule 56(a) mandates the entry of summary judgment upon motion after there has been adequate time for discovery "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is proper when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994). A disputed issue is "genuine" when the evidence produced "is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is considered "material" if it "might affect the outcome of the suit under the governing law." *See id.* "[T]he substantive law will identify which facts are material . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

"In considering a motion for summary judgment the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Great Plains Real Estate Dev., L.L.C. v. Union Cent. Life Ins. Co.*, 536 F.3d 939, 944 (8th Cir. 2008) (quoting *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008)). Rather, the court determines whether there are any disputed issues concerning the existence of material facts and, if so, whether those disputes are genuine. *See Anderson*, 477 U.S. at 251–52; *see also Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir. 1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact."). Summary judgment is appropriately entered against a party who fails to make a showing sufficient to establish a genuine dispute as to the existence of an element essential to its case and upon which

the party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When a summary judgment motion is filed, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See id.* at 323; *Anderson*, 477 U.S. at 248. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed. R. Civ. P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or admissions in the record. *Id.*; *Celotex*, 477 U.S. at 322–23; *Anderson*, 477 U.S. at 257. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. Indeed, "[t]o survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second and third alterations in original) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733–34 (8th Cir. 2003)). Mere "self-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010).

Courts do not decide whether to grant a motion for summary judgment by conducting a paper trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) ("The district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe."). In considering a motion for summary judgment,

the court's task is merely to decide, based on the evidentiary record that accompanies the filings of the parties, whether there really is any genuine issue concerning a material fact that still requires a trial. *See id.* (citing *Anderson*, 477 U.S. at 249; 10 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 (3d ed. 1998)); *see also* Fed. R. Civ. P. 56(c)(3).

## III.  ANALYSIS

"Summary judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir. 1998).  Plaintiff has the burden of proof in this civil rights action.  To find for Defendant, the Court need only find a genuine dispute of material fact lacking as to one essential element of Plaintiff's claim.  *See Celotex Corp.*, 477 U.S. at 322.  Conversely, Plaintiff can only win on summary judgment if no genuine dispute exists as to any fact necessary to her case.[2]  As discussed below, Plaintiff prevails on summary judgment as to Counts I and II of the Complaint.

In this case, Plaintiff, who is of course entitled to the protection of the law, is asserting she was instead deprived of this protection by law enforcement.  Litigation alleging police misconduct has increased in the wake of highly publicized incidents of police brutality such as the murder of Mike Brown by a Ferguson police officer in 2014.  *Policing*, Civil Rights Litigation Clearinghouse (Feb. 22, 2021, 9:00 AM) https://www.clearinghouse.net/results.php?ct=PN (tagging 314 search results from 1962 to the present as involving policing with ninety cases filed since August 9, 2014).  As a result, many police departments have acquiesced to public demands to add body cameras to police uniforms. Rich Braunstein & David Erickson, *Best Practices, Challenges and Opportunities for Body Worn*

---

[2] Thus, Plaintiff's Motion is necessarily a partial motion.  Even if the Court finds completely in Plaintiff's favor, it does not have jurisdiction to measure Plaintiff's damages as a matter of law.  A jury trial is always required on the question of damages.  *See Wages v. Stuart Mgmt. Co.*, 798 F.3d 675, 682 (8th Cir. 2015).

*Camera Programs*, 63 S.D. L. Rev. 510, 510–11 (2019).  These cameras may serve several purposes, including recording evidence that can be used in judicial proceedings.  *Chapter Four Considering Police Body Cameras*, 128 Harv. L. Rev. 1794, 1803 (2015).

Two police body cameras served precisely this function in Plaintiff's case, and the evidence they provide clearly renders Defendants' factual disputes disingenuous.  The record demonstrates Plaintiff declined to cooperate with CPW Krug prior to the police visit, and CPW Krug "advised that [her supervisor or the Polk County Attorney] would set up a meeting to speak with her regarding the concerns to determine what further steps need taken."  ECF No. 29 at 30.  Instead, CPW Krug returned to Plaintiff's home just over two hours later accompanied by four police officers.  *Id.* at 30, 41.  Defendants assert Plaintiff "refused" access to her child "multiple times" during this "continued" altercation and even claim the officers "asked [Plaintiff] five times in various ways to see the child."  *Id.* at 30, 43; ECF No. 28 at 14.  In stark contrast, the body camera footage reveals a five-minute interaction during which Defendant Westlake immediately responded to Plaintiff's mistrust with frustration and argument.  In fact, the only direct request regarding contacting L.B. occurred when Plaintiff herself asked, "Do you need to speak to her?"  ECF No. 29 at 75; ECF No. 23 Ex. 1 at 1:50, Ex. 2 at 9:15.  Further, when Defendants arrested Plaintiff, she was actively offering Defendant Westlake access to her home with L.B. inside.  ECF No. 23 Ex. 1 at 5:06–6:19, Ex. 2 at 12:30–13:43.  Although Plaintiff's attitude toward Defendants was not friendly, the body camera footage reveals Defendants never clearly asked Plaintiff for access to L.B., nor did Plaintiff ever actively interfere with Defendants' investigation.

Plaintiff did nothing more than prolong a voluntary contact with police, yet Defendants arrested her for interference with official acts pursuant to Iowa Code section 719.1(1)(a).  The

body camera footage proves unequivocally that Defendants lacked probable cause to arrest Plaintiff for this offense. Further, as they admitted in deposition, Defendants lacked probable cause and arguable probable cause to arrest Plaintiff for child abuse, and no exigent circumstances justified Plaintiff's warrantless arrest. ECF No. 129 at 139, 145. Based upon these facts, the Court would waste precious judicial resources if it allowed a jury trial as to Counts I and II of Plaintiff's Complaint. *See Anderson*, 545 F.2d at 1129. Thus, the Court grants Plaintiff's Motion for Partial Summary Judgment as to Counts I and II and denies the Motion as to Counts III and IV for the reasons set forth below. The Court denies Defendants' Motion for Summary Judgment based on their assertion of qualified immunity.

### A. *Deprivation of Fourth Amendment Rights*

Section 1983 of Title 42 of the United States Code creates a cause of action when a person acting "under color of any statute . . . of any State . . . subjects or causes to be subjected . . . any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . ." Plaintiff asserts Defendants Westlake and Kelly, acting under color of state law, violated her constitutionally protected right to be free of unreasonable seizures under the Fourth Amendment to the U.S. Constitution and article 1, section 8 of the Iowa Constitution. ECF No. 1 ¶¶ 44–46; U.S. Const. amend. IV; Iowa Const. art. 1, § 8.

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Gregory v. City of Rogers*,

974 F.2d 1006, 1009 (8th Cir. 1992). Defendants do not dispute that they acted under color of state law in arresting Plaintiff. *See* ECF No. 28 at 8–18; *Roe v. Humke*, 128 F.3d 1213, 1215 (8th Cir. 1997) ("[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." (quoting *West*, 487 U.S. at 49–50)). Thus, the Court need only determine whether Plaintiff has sufficiently alleged a violation of her rights as secured by the Fourth Amendment of the Constitution.

The Fourth Amendment protects "the right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. An arrest is "the quintessential 'seizure of the person' under" the Fourth Amendment. *California v. Hodari D.*, 499 U.S. 621, 624 (1991). For an arrest to be reasonable, the seizure must be supported by probable cause, defined by "whether, at the moment the arrest was made, . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

In this case, Plaintiff's arrest for interference with official acts constituted an unreasonable seizure, because Defendants lacked probable cause to justify the arrest. Under Iowa law, "[a] person commits interference with official acts when the person knowingly resists or obstructs anyone known by the person to be a peace officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer . . . ." Iowa Code § 719.1(1)(a). The statute makes clear "[t]he terms 'resist' and 'obstruct', as used in this section, do not include verbal harassment unless the verbal harassment is accompanied by a present ability and apparent intention to execute a verbal threat physically." *Id.* § 719.1(3). Rather, the term "resist" implies "actual opposition to the officer through the use of actual or constructive

force" and does not include "words or even threats alone." *State v. Donner*, 243 N.W.2d 850, 854 (Iowa 1976). The term "'obstruct' is more broad than 'resist,' and includes putting obstacles in the path of officers completing their duties." *State v. Hauan*, 361 N.W.2d 336, 339 (Iowa Ct. App. 1984). However, "obstruct" does not create a "duty to answer . . . questions" during a police contact. *Id.* at 340.

Based on the foregoing, Defendants had no probable cause to arrest Plaintiff for interference with official acts. While Defendants may have found Plaintiff to be "belligerent," ECF No. 29 at 43, at no point did her actions threaten the officers with actual or constructive force. *See* ECF No. 23 Ex. 1, Ex. 2. As Defendants acknowledge, they had no warrant to search Plaintiff's home for L.B. and no exigent circumstances necessitated L.B.'s immediate protection. ECF No. 29 at 145. Therefore, Plaintiff's interaction with Defendants was a consensual encounter during which she was free to "refuse to cooperate and go on [her] way." *Hauan*, 361 N.W.2d at 340 (quoting *Terry v. Ohio*, 392 U.S. 1, 34 (1968) (White, J., concurring)). "Simply 'object[ing]' or even passively 'failing to cooperate' with law enforcement officers does not provide arguable probable cause under Iowa Code section 719.1(1); the statute requires proof that the defendant 'active[ly] interfer[ed]' with the law enforcement officer." *McCabe v. Macaulay*, 551 F. Supp. 2d 771, 794 (N.D. Iowa 2007) (alterations in original) (quoting *State v. Smithson*, 594 N.W.2d 1, 2 (Iowa 1999)). Plaintiff has thus established as a matter of law that Defendants violated her Fourth Amendment right to be free from an unreasonable seizure.

Although Plaintiff has met her burden to establish a constitutional violation under § 1983, Defendants argue they are entitled to summary judgment under the doctrine of qualified immunity. "Qualified immunity shields government officials from suit unless their conduct violated a clearly established constitutional or statutory right of which a reasonable person would

have known." *Yowell v. Combs*, 89 F.3d 542, 544 (8th Cir. 1996). The foregoing analysis demonstrates that Defendants violated a constitutional right. *Pearson v. Callahan*, 553 U.S. 223, 231 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Court now considers whether that right was "clearly established" at the time of Plaintiff's arrest. *Id.* at 236.

"It is clearly established that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010). However, even after a warrantless arrest, "an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)). "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is 'objectively reasonable.'" *Id.* at 523 (quoting *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008)). "[T]he existence of probable cause or arguable probable cause depends on the viewpoint of an objectively reasonable officer, not the viewpoint of the particular arresting officer." *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1060 (8th Cir. 2013) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).

In the instant case, Defendants lacked arguable probable cause to arrest Plaintiff. "Police officers enjoy 'the liberty (again, possessed by every citizen) to address questions to other persons,' although 'ordinarily the person addressed has an equal right to ignore his interrogator and walk away.'" *United States v. Mendenhall*, 446 U.S. 544, 553 (1980) (quoting *Terry*, 392 U.S. at 32–33 (Harlan, J., concurring)). However, "if the person refuses to answer and the police take additional steps . . . to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure." *INS v. Delgado*, 466 U.S. 210, 216–17 (1984). These longstanding principles are now commonly included in police

training and understood by police officers.  *See* Devallis Rutledge, *Consensual Encounters*, Police Mag., Feb. 5, 2016, https://www.policemag.com/341967/consensual-encounters; *accord* ECF No. 29 at 139–40.  Thus, the right to terminate a voluntary or consensual encounter with police without fear of unreasonable seizure is clearly established.

Defendants testified they received training from the City of Des Moines on the interference with official acts statute and relevant case law.  ECF No. 29 at 140, 161.  Plaintiff's actions on October 16 were purely verbal, and therefore clearly failed the standard for interference with official acts under the plain language of the statute and established state precedent.  Iowa Code § 719.1(3); *Donner*, 243 N.W.2d at 854.  Therefore, Defendants had no "minimal level of objective justification," *Delgado*, 466 U.S. 210, 217, to arrest Plaintiff for interference with official acts when she declined to cooperate during a voluntary police encounter, and the arrest was objectively unreasonable.  Defendants cannot claim the protection of qualified immunity for this violation of a clearly established right.

Because the standard for arguable probable cause is an objective one, an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."  *Devenpeck*, 543 U.S. at 153.  In other words, qualified immunity should apply so long as probable cause or arguable probable cause exists of any crime, not just the stated offense.  *Id.*  It follows that "when a state official pursuing a child abuse investigation takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is properly founded upon a reasonable suspicion of child abuse."  *Whisman ex rel. Whisman v. Rinehart*, 119 F.3d 1303, 1310 (8th Cir. 1997) (citation omitted).  Nonetheless, "'officers have a duty to conduct a reasonably thorough investigation'" prior to an arrest unless exigent circumstances "led the officers to believe there

was an immediate or imminent danger." *Ross v. City of Jackson*, 897 F.3d 916, 922 (8th Cir. 2018) (quoting *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 2018)).

The only evidence of child abuse by Plaintiff that Defendants possessed at the time of her arrest was a statement by L.B. that Plaintiff had hit L.B. in the past. *See* ECF No. 29 at 29–31. Defendants did not investigate L.B.'s statements further except to call the Polk County Attorney's Office. *Id.* at 139. At this time, Defendants were informed they had probable cause to arrest Plaintiff's partner, Robert Rushing, but Defendants "never had any indication [they] had probable cause to arrest Trenisha Webster." *Id.* After the five-minute interaction ending in Plaintiff's arrest, Defendants admitted they still lacked probable cause to arrest Plaintiff "for child endangerment or any crime involving assaulting her daughter." *Id.*

Defendants also lacked exigent circumstances justifying Plaintiff's warrantless arrest. In deposition, Defendant Westlake and counsel had the following exchange:

> Q. I mean if you were truly concerned about the welfare of the child, you could have just, according to you, went right in the house; right?
> A. No, I wouldn't have done that.
> Q. Why is that?
> A. I would have gotten a search warrant.
> Q. And you would have gotten a search warrant because you didn't have consent; right?
> A. If I had exigent circumstances to believe that a child's life was in danger, then I would have.
> Q. So I guess that's my question. You didn't have any exigent circumstances that the child's life was at stake; right?
> A. At that moment I did not.
> Q. When we're talking about "that" moment, we're talking about up to and when Trenisha Webster was arrested; right?
> A. I didn't know.
> Q. Right. But you didn't have exigent circumstances?
> A. I did not.

*Id.* at 145. Thus, no exigent circumstances justified Plaintiff's warrantless arrest, and Defendants lacked probable cause to arrest Plaintiff for interference with official acts, child abuse, or any

other crime.  Plaintiff's right to be free from this unlawful arrest was clearly established on

October 16, 2018.  These factors conclusively establish that Defendants' justification for

Plaintiff's arrest and claim of qualified immunity have no basis in material fact.  *See Wilson*, 823

F. 2d at 256.  Therefore, Defendants are not entitled to qualified immunity, and the Court grants

Plaintiff's Motion for Partial Summary Judgment as to Count I of the Complaint.  Defendants'

Motion for Summary Judgment is denied.  A jury trial will be held to determine the amount of

Defendants' liability for this violation.

## B.  *False Arrest*[3]

False arrest is a common law tort claim under Iowa law.  The elements of false arrest are

"(1) detention or restraint against one's will and (2) unlawfulness of the detention or restraint."

*Children v. Burton*, 331 N.W.2d 673, 678–79 (Iowa 1983).  The parties agree the legal standards

and evidence supporting this claim are substantially similar to those supporting Plaintiff's Fourth

Amendment claim under § 1983.  ECF No. 23-2 at 11; ECF No. 28 at 19.  Plaintiff's arrest was,

of course, against her will.  The arrest was unlawful, because it violated Plaintiff's Fourth

Amendment right to be free from unreasonable seizure.  Thus, Plaintiff has proved no genuine

dispute of material fact exists with respect to her claim of false arrest, and Plaintiff is entitled to

summary judgment as a matter of law.  Plaintiff's Motion for Partial Summary Judgment is

therefore granted as to Count II of the Complaint, and Defendants' Motion for Summary

---

[3]This Court has subject-matter jurisdiction over this case because Count I of the Complaint is based in federal law, and the subsequent state-law claims are substantially related. ECF No. 1 ¶ 5.  In a case involving federal question jurisdiction, "if the federal claims are dismissed before trial, 'the state claims should be dismissed as well.'"  *Koke v. Stifel, Nicolaus, & Co., Inc.*, 620 F.2d 1340, 1346 (8th Cir. 1980) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).  Having granted summary judgment on the only federal question in the Complaint, the pendant claims would ordinarily be dismissed.  However, the Court retains jurisdiction over Plaintiff's state-law claims, because a federal jury question remains as to the amount of Plaintiff's damages.

Judgment is denied. A jury trial will be held to determine the amount of Defendants' liability for this violation.

## C. Abuse of Process

Abuse of process is a common law claim under Iowa law involving "the use of legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed." *Palmer v. Tandem Mgmt. Servs., Inc.*, 505 N.W.2d 813, 817 (Iowa 1993). "The three elements of an abuse-of-process claim are: (1) the use of a legal process; (2) its use in an improper or unauthorized manner; and (3) the plaintiff suffered damages as a result of the abuse." *Fuller v. Loc. Union No. 106 of United Brotherhood of Carpenters & Joiners*, 567 N.W.2d 419, 421–22 (Iowa 1997). Without a doubt, an arrest constitutes "the use of a legal process." *Id.* To establish the second element, "[t]he plaintiff must prove that the defendant used the legal process *primarily* for an impermissible or illegal motive." *Wilson v. Hayes*, 464 N.W.2d 250, 266 (Iowa 1990).

The Court is not in a position to determine Defendants' primary motive in arresting Plaintiff. Defendant Westlake stated in deposition that she arrested Plaintiff "[f]or interfering with my ability to check on the welfare of her child." ECF No. 29 at 143. Defendant Kelly testified she joined Defendant Westlake to provide "backup." *Id.* at 157. It is the jury's province to consider these statements and evaluate Defendants' credibility.[4] *See Great Plains Real Estate Dev., L.L.C.*, 536 F.3d at 944. Thus, the Court denies both Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment as to Count III of the Complaint.

---

[4] The third element of damages is also a jury question, as explained above in note two.

*D. Respondeat Superior*

Under federal law, municipalities are shielded from tort liability for the actions of their employees by way of a respondeat superior theory. *Monell v. Dep't Soc. Servs.*, 436 U.S. 658 (1978). However, Iowa law provides that a municipality is liable for torts "of its officers and employees, acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function." Iowa Code § 670.2. This rule is subject to numerous exceptions contained in Iowa Code section 670.4. Plaintiffs assert Defendant City of Des Moines is liable for the actions of Defendants Westlake and Kelly under Iowa law. ECF No. 23-2 at 12–13. Defendants assert the City is immune from suit under Iowa Code section 670.4(1)(c) and 670.4(1)(k).

Iowa Code section 670.4(1)(c) exempts a municipality from liability for

> "Any claim based upon an act . . . of an officer . . . exercising due care, in the execution of a statute . . . or based upon the exercise or performance [of] a discretionary function or duty on the part of the municipality . . . whether or not the discretion is abused."

This exemption is commonly referred to as "discretionary function" immunity. *See* ECF No. 28 at 21. In evaluating a claim of discretionary function immunity, Iowa courts apply a two-pronged test. *Goodman v. City of Le Claire*, 587 N.W.2d 232, 237 (Iowa 1998). First, "[i]n examining the nature of the challenged conduct, a court must consider whether the action is a matter of choice for the acting employee." *Id.* (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). Then, "a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* (quoting *Berkovitz*, 486 U.S. at 536). "The general rule is that of municipal liability—immunity is the exception." *Graber v. City of Ankeny*, 656 N.W.2d 157, 161 (Iowa 2003).

Generally, "an illegal arrest or prosecution does not represent a choice based on plausible policy considerations," and discretionary function immunity does not apply. *Cline v. Union Cnty.*, 182 F. Supp. 2d 791, 800 (S.D. Iowa 2001). Further, Defendants Westlake and Kelly both implicated the City of Des Moines by stating they were trained that a person could be arrested for interference with official acts for refusing access to a home during a warrantless child abuse investigation. ECF No. 29 at 140, 161. Thus, discretionary function immunity is inapplicable to this case, and the City of Des Moines is not immune from trial on these grounds.

Iowa Code section 670.4(1)(k) protects municipalities from claims "based upon or arising out of an act or omission of a municipality in connection with an emergency response." Under Iowa law, the exemption applies if, when the challenged action occurred, "it can be said as a matter of law that an emergency existed." *Keystone Elec. Mfg., Co. v. City of Des Moines*, 586 N.W.2d 340, 350 (Iowa 1998). As stated above, summary judgment is appropriate as to Count I of the Complaint because no emergency existed as a matter of law when Defendants arrested Plaintiff. Thus, emergency response immunity is also inapplicable in this case.

That the City is not immune from suit does not necessarily render it liable for the actions of Defendants Westlake and Kelly. The evidence against Defendant City of Des Moines is insufficient for the Court to find the City responsible for the actions of Defendants Westlake and Kelly as a matter of law. Defendants' relative liability is better decided through the verdict of a reasonable jury. *See Anderson*, 477 U.S. at 248. The Court therefore denies Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment as to Count IV of the Complaint.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (ECF No. 23) is GRANTED as to Counts I and II of the Complaint and DENIED as to Counts III and IV.  Defendants' Motion for Summary Judgment (ECF No. 26) is DENIED.  A jury trial will be held to determine the amount of Plaintiff's damages as to Counts I and II of the Complaint and to decide Counts III and IV.

IT IS SO ORDERED.

Dated this 24th day of February, 2021.

ROBERT W. PRATT, Judge
U.S. DISTRICT COURT